643 So.2d 323 (1994)
Mark Alan HEBERT, Plaintiff-Appellant,
v.
Vincent TALBOT, et al., Defendants-Appellees.
No. 26009-CA.
Court of Appeal of Louisiana, Second Circuit.
September 21, 1994.
A. Richard Snell, for plaintiff-appellant.
James Fortson, for Vincent Talbot, defendant-appellee.
Theodore J. Casten, for State Farm, defendant-appellee.
Before SEXTON and BROWN, JJ., and WESTERFIELD, J. Pro Tem.
BROWN, Judge.
Plaintiff, Mark Alan Hebert, sued defendants, Vincent Talbot and State Farm Fire and Casualty Company (hereafter State Farm), for damages suffered as a result of Talbot's actions. In a criminal case, Talbot was convicted of, cruelty to a juvenile, LSA-R.S. 14:93. State Farm moved for summary judgment based on a clause in its liability policy which excludes coverage for intentional acts and for personal injuries arising out of the willful violation of a penal statute or ordinance. The trial court granted defendants' motion and plaintiff appeals.

FACTS
In an unpublished opinion, this court set forth the following facts in affirming the criminal conviction of Talbot:
When the charges arose in 1989, Terri Forbes, then age 34, lived at a Shreveport residence with three of her children, Mark Hebert, 16; Matthew Hebert, 12; and Elizabeth Hebert, 8. She was divorced in 1988 from her husband who had abused her and Mark, the first child. Talbot, Forbes' boyfriend, provided her with a residence and with a job managing the adjacent Embassy Apartments which his family owned and in which complex he had an *324 apartment. He was then a 34-year-old single man.
During the weekend of March 4-5, 1989, Mark Hebert burglarized the apartment of Cleve Taylor, a tenant at the Embassy Apartments, using his mother's passkey to make his unauthorized entry and stealing Taylor's gold ring. Forbes and Talbot confronted Mark about the ring and made him remove his clothing, except for his shorts. Talbot began striking Mark with a motorcycle antenna and a cardboard tube or stick and eventually caused Mark to confess to stealing Taylor's ring. Mark was then handcuffed and a duffle bag was placed over his head. Mark remained handcuffed and covered until Taylor returned from work to his apartment two to three hours later. Mark was made to return the ring and apologize to Taylor. He was then arrested upon Talbot's insistence that Taylor press charges. Juvenile authorities released Mark to his mother's custody.
Mark had had disciplinary problems before. During the eight months he lived in Shreveport, he was generally disrespectful to his mother and Talbot. On earlier occasions, he stole $100 of rent money from his mother, pulled a gun on her, and twice ran away from home, the last time shortly before he stole Taylor's ring. Before moving in with his mother, Mark lived with his grandmother in Magnolia, Arkansas, for four years. He moved to his mother's house after his grandmother and juvenile authorities in Arkansas had difficulty disciplining him.
After Mark was released to his mother by Caddo juvenile authorities, Talbot and a friend, Tommy Sharply, constructed a cage in the back bedroom of Forbes' house out of 2' × 6' lumber and wire mesh purchased by Forbes. The cage was approximately 5' × 9' and extended from floor to ceiling. Inside of the cage, there were mats, blankets, an ice chest which served as a desk, a chair, books, a lamp, and a portable vacuum cleaner. Mark was placed in this cage when it was finished about 1:00 a.m. on March 9, 1989, even though he had not attempted to run away after juvenile authorities released him to his mother's custody.
After daylight that same morning, Matthew argued with and cursed his mother and then disobeyed her order not to go to school. Forbes and Talbot checked Matthew out of school at about 10:00 a.m. that morning, took him home and placed him in the cage with Mark.
The boys generally remained in the cage from March 9 until March 13. During this time, Matthew was allowed out of the cage once to do yard work. Mark refused to do any yard work, later explaining that he would not have been allowed to wear shoes. Matthew said Talbot struck him in the stomach with his fist when Matthew told him that he did not want to rake leaves, but admitted that the blow may not have been intentional and could have been the result of Talbot grabbing for the antenna Matthew had taken from him. Matthew was allowed to shower and use bathroom facilities on the one occasion he was allowed out of the cage to do yard work. Mark was not allowed outside the cage to shower, but was provided with a basin and water on one occasion. Otherwise, both boys were given a paper sack and a 2-liter soft drink bottle in which to relieve themselves.
On Saturday night, March 11, 1989, Forbes and Talbot drove from Shreveport to Magnolia, leaving the boys in the care of their 8-year old sister. She had a key and was instructed to let them out of the cage only in case of a fire. Forbes said she arranged for two adults, William T. Sharply and Kay Duco, to check on the boys. Talbot said he had left a key wrapped in plastic within reach of the boys in case of an emergency. Mark agreed the key was within reach some of the time.
On the morning of March 13, 1989, after telling his mother he was breaking out, Mark used a metal chair to force an opening and "escaped" from the cage. Forbes called Talbot who fought with and attempted to restrain Mark. Talbot threatened to knock Mark unconscious with a broomstick if he did not get back in the cage. Mark ran outside the house where the scuffle *325 continued. Mark fell on the concrete and was struck by Talbot several times.
Shreveport Officer R.L. Huckaby responded to Talbot's complaint that Mark Hebert was beating his mother. When Officer Huckaby arrived at the residence, Talbot told him that Mark ran away after scuffling with him. About a half block away Officer Huckaby found Mark, whose feet and arms were cut and scraped and whose toes were bloody. Mark appeared afraid and had begun to cry, but was persuaded by Huckaby to return with him to resolve Mark's situation at home.
When they arrived at the house, Forbes told Huckaby she put Mark in the cage to control him because she was tired of the way he had been acting and the things he had been doing. Officer Huckaby then inquired about the cage and, after investigation, reported the mother and Talbot to Caddo juvenile authorities.
State v. Forbes, No. 23,713-KA (La.App. 2d Cir. 09/25/91), 585 So.2d 1258.
As a result of these actions, Hebert was placed in foster care and Talbot and Hebert's mother were convicted of cruelty to a juvenile.
Hebert filed suit against Talbot and State Farm, alleging: Talbot is the son of Benjamin P. Talbot, Sr., who died September 6, 1986. Even though Talbot, Sr., was deceased, State Farm issued a liability policy to Ben P. Talbot, Sr., d/b/a Embassy House Apartments. In an amended petition, Hebert named the widow and another son of Ben P. Talbot, Sr., as additional defendants. Plaintiff asserted that Vincent Talbot was an employee or agent of the majority owner, the widow, and his brother.
In its motion for summary judgment, State Farm urged that the rental dwelling policy issued to the Estate of Ben Talbot was written on April 7, 1989. Hebert agreed that this policy was issued after the incident and was thus not applicable. State Farm does not dispute, however, that the apartment liability policy issued to the Talbot estate covered Vincent Talbot's acts at the time and place of this incident. In support of its motion for summary judgment, State Farm attached the two policies and a portion of the trial transcript containing the jury's guilty verdict against Vincent Talbot for cruelty to a juvenile.

DISCUSSION
State Farm contends that the policy excluded coverage for bodily injuries resulting from intentional acts and for personal injuries arising out of the willful violation of a penal statute. The pertinent policy provisions are:
Section II, Definitions
12. occurrence means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured and with respect to personal injury, the commission of an offense, or a series of similar or related offenses. This definition shall include any intentional act by or at the direction of the insured which results in bodily injury, if such injury arises solely from the use of reasonable force for the purpose of protecting persons or property;
Section II, Business Liability Exclusions
Under Coverage L, this policy does not apply:
16. to personal injury arising out of the willful violation of a penal statute or ordinance committed by or with knowledge or consent of any insured;
Only copies of the policies and portions of the criminal case were presented in support of the summary judgment motion. We are aware that different approaches are employed in the prosecution of a criminal case as opposed to the pursuit of a civil action. In affirming Talbot's criminal conviction, this court set forth the testimony of the witnesses as follows:
Here, Mark admitted several incidents where he should have been disciplined. He also testified that Talbot whipped him with a rubber-covered antenna every other day or so. Mark has not been in any trouble since being placed in a foster home. Mark stated that while in the cage his mother brought him a wash basin with water on one occasion. He said he did not *326 like being locked up in the cage, that it made him feel like an animal.
Dr. Robert Savory, a medical expert in family practice and in the treatment of abused children, examined Mark on March 13, 1989, and Matthew the next day. He noted that both boys had recent lesions and bruises on several locations on their bodies. Mark told Dr. Savory that during a scuffle with Talbot he fell on the concrete and was hit in the stomach. There was also some mention that Matthew was whipped with an automobile antenna and with copper tubing. According to Dr. Savory, the injuries on the boys were nonaccidental type injuries, and his objective findings matched the data that the boys were struck or abused.
Betsy Walpool, a State child protection investigator, testified that Forbes (mother) allowed her to see the cage. At the preliminary hearing, Walpool testified that Forbes admitted to her that she beat the boys with the rubber tip of an antenna. Mark and Matthew stated the marks and bruises on them were the result of whippings they received from their mother. Forbes explained to Walpool that she and Talbot confined Mark because he had been arrested for burglary and the authorities were not acting fast enough. Talbot refused to talk to Walpool, who testified that Mark had bruises and marks on the back of his head, on his face, back, and shoulders, and that Matthew had some older marks and scars on him.
Patsy S. Evans, of the Shreveport Police Department Youth Bureau, testified that Forbes said that she had placed the boys in the cage because she did not feel that she could control them and that Mark deserved any marks on him.
Dr. Gerald Baker, a criminal psychologist, testified that confinement in a 5' × 9' enclosure or cage for a four-day period would have an adverse psychological effect on a juvenile. He stated that the problem would be compounded if the child was unaware of when the confinement would end. According to Dr. Baker, the boys experienced some psychological trauma from being incarcerated in this circumstance, being denied sanitary facilities and an opportunity to go to school, and not being told when they might be released. He opined the boys would need on-going psychological treatment. He further explained that the boys' psychological problems were more likely the result of their total life experience than any one single incident. Dr. Baker found that much of what Mark was going through was simply teenage rebellion, and indicated that the nature of one's earlier childhood affects the type or degree of the teenage rebellion.
Educational and counseling psychologist, Dr. Donita Gothard, interviewed and evaluated Matthew, Mark and Forbes. Dr. Gothard opined that Mark, but not Matthew, had a disruptive behavior disorder. She said the cage was less restrictive than locking the boys in a room, and that being confined at home was less restrictive than being confined in a prison. She compared their incarceration to a "time-out" program which is designed to give the incarcerated person time to reflect on his or her behavior.
State v. Forbes, supra. (Emphasis added).
Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. Young v. Shelter Ins. Co., 604 So.2d 199 (La.App.2d Cir.1992), writ denied, 607 So.2d 559 (La.1992); Ouachita National Bank in Monroe v. Gulf States Land & Development, Inc., 579 So.2d 1115 (La.App.2d Cir.1991), writ denied, 587 So.2d 695 (La.1991).
Because the mover has the burden of establishing that no material factual issue exists, inferences to be drawn from the underlying facts contained in the materials before the court must be viewed in the light most favorable to the party opposing the motion. Reese v. Tayco Food Store, Inc., 602 So.2d 260 (La.App.2d Cir.1992).
Obviously, the experts and witnesses at the criminal trial disagreed on material fact questions. The criminal jury's credibility findings are not discernable from the record; *327 however, they would not necessarily resolve all matters in a related civil action. This record does not indicate whether all acts of Talbot and Forbes constituted the criminal elements, or whether guilt was based on separate and distinct conduct, i.e., the beating, caging or deprivation of services. Because a civil case may present different questions, the trial court wrongly granted summary judgment based solely on evidence of the criminal convictions.
Reversed and Remanded.
SEXTON, J., concurs.